**Daniel J. KRUSE et al., Plaintiffs,**

v.

**W. E. CAMPBELL et al., Defendants.**

**Civ. A. No. 75–0622–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

March 23, 1977.

Stephen W. Bricker, Richmond, Va., for plaintiffs.

Walter H. Ryland, John A. Rupp, James K. Cluverius, Richmond, Va., William E. Donnelly, III, Asst. County Atty., Alan S. Anderson, Thomas J. Crawley, Fairfax, Va., William G. Broaddus, John L. Knight, Richmond, Va., for defendants.

Before BUTZNER, Circuit Judge, and MERHIGE and WARRINER, District Judges.

MERHIGE, District Judge.

The instant case is a class action for declaratory and injunctive relief challenging the provisions of Section 22–10.8(a) of the Virginia Code of 1950 (1976 Supp.), and the practice of Virginia's welfare depart-

ments, which allegedly deny to the handicapped children of poor parents the ability to obtain an appropriate education, when such is not available in the public schools, except if the parents agree to relinquish custody of their children to the welfare department, in violation of the First, Ninth and Fourteenth Amendments to the United States Constitution and in violation of the Rehabilitation Act of 1973, 29 U.S.C. Section 794 (as amended) and the Social Security Act, 42 U.S.C. Section 601 *et seq.*

The class of plaintiffs consists of all those handicapped children in Virginia, and their parents, who are, have been, or will in the future be eligible for tuition assistance grants pursuant to Virginia Code Section 22–10.8(a) (1975 Supp.) but whose parents are unable to pay the proportional costs of an appropriate private educational placement, not covered by such tuition assistance, because of a lack of financial resources.

The defendants are the Superintendent of the Department of Education of the Commonwealth of Virginia, the members of the Board of Education of the Commonwealth of Virginia, the Division Superintendent and members of the School Board of Fairfax County, Virginia, the Division Superintendent and members of the School Board of Henrico County, Virginia, the Commissioner of the Department of Welfare of the Commonwealth of Virginia, the members of the Board of Welfare of the Commonwealth of Virginia, the Director of the Department of Social Services and members of the Board of Social Services of Fairfax County, Virginia, and the Director of the Department of Public Welfare and members of the Board of Public Welfare of Henrico County, Virginia.

Jurisdiction is attained pursuant to 28 U.S.C. Sections 1331 and 1343. The amount in controversy exceeds $10,000 exclusive of costs and interests. A three-judge court has been designated as was then required by 28 U.S.C. Section 2281.

The Commonwealth of Virginia through local school boards, as regulated and partially funded by the State Board of Education, has provided a free public school system for all children between the ages of 5 and 21. Virginia Code Section 22–1.1. All normal and some "handicapped"[1] children receive a free and appropriate educational opportunity within this system.

Consistent with the regulations of the Board or Education, each local school board is required to develop an annual plan and provide a comprehensive program of "special education"[2] for the handicapped children within its locality. Va.Code §§ 22–10.4 and 22–10.5 (1976 Supp.)

However, there were 36,434 handicapped children in the state during the 1975–76 school year who were identified as in need of special education but who were not provided with any appropriate special education program. In contrast, during the same school year, all other children in Virginia, a total of 1,106,186, received publicly supported and appropriate educational instruction, including 80,467 handicapped children who obtained appropriate public programs and 2,426 handicapped children who obtained appropriate private programs with the aid of state tuition grants pursuant to Va. Code § 22–10.8(a). This statute provides that "[i]f a school division is unable to provide appropriate special education . . . [and] such education is not available in a State school or institution" a parent or guardian is eligible to be partially reim-

---

1. § 22–10.3. Definitions.—As used in this chapter:

(a) *"Handicapped children"* includes all children in the Commonwealth between the ages of two and twenty-one years who are mentally retarded, physically handicapped, emotionally disturbed, learning disabled, speech impaired, hearing impaired, visually impaired, multiple handicapped or otherwise handicapped as defined by the Board of Education.

2. § 22–10.3. Definitions.—As used in this chapter:

(b) *"Special education"* means classroom, home, hospital, institutional or other instruction to meet the needs of handicapped children, transportation, and corrective and supporting services required to assist handicapped children in taking advantage of, or responding to, educational programs and opportunities commensurate with their abilities. (1974, c. 480)

bursed through state tuition grants for the cost of enrollment of the child in a private program.[3]

In order to qualify for such a grant, the child's needs and educational development must be reviewed by a local Special Education Placement Committee. The committee's recommendations are referred to the local school division superintendent who then certifies or disapproves the student's eligibility based on State Board of Education regulations. Reimbursement is made upon documentation of enrollment in a school approved by the State Board of Education.

Reimbursement is made by the local board for seventy-five percent (75%) of the tuition costs up to a maximum of $5,000 for the costs of a residential program and $1,250 for a non-residential program. Stat-utory authority is granted to local boards to exceed these maximums at their discretion but the great majority of local boards have no general policy of doing so.[4] The State Department of Education then reimburses the local school boards for sixty percent (60%) of the amount paid parents for eligible children, up to $3,000 for residential and $750 for non-residential programs.

Most of the approved private schools charge tuition fees substantially greater than the required state and local share of the tuition grant. During the school year 1975–76, the average charge was $10,345 for a residential program and $3,513 for a non-residential program. These charges are anticipated to increase for coming school years by reason of inflation. Even where the costs of the private program fall within the maximum grant allowances, the

3. § 22–10.8. Reimbursement of parents or guardian of handicapped children in private schools; reimbursement of local boards from State funds.—(a) If a school division is unable to provide appropriate special education for a handicapped child, such education is not available in a State school or institution, and the parent or guardian of any such child pays or becomes obligated to pay for his attendance at a private nonsectarian school for the handicapped approved by the Board of Education, the school board of such division shall pay the parent or guardian of such child for each school year three fourths of the tuition cost for such child enrolled in a special school for handicapped children; provided that the school board shall not be obligated to pay more than twelve hundred fifty dollars to the parent or guardian of each such child attending a nonresidential school nor to pay to the parent or guardian of each child attending a residential school more than five thousand dollars. The school board, from its own funds, is authorized to pay to the parent or guardian such additional tuition as it may deem appropriate. Of the total payment, the local school board shall be reimbursed sixty per centum from State funds as are appropriated for this purpose, which amount shall not exceed seven hundred fifty dollars for a handicapped child in a nonresidential school nor three thousand dollars for a handicapped child in a residential school; provided, however, that the local school board is not required to provide such aid if matching State funds are not available. In the event State funds are not available, the local school board shall pay the parent or guardian tuition costs of such child in an amount equal to the actual per pupil cost of operation in the aver-age daily membership for the school year immediately preceding, and such school board shall be entitled to count such pupils and receive reimbursement from the basic school aid fund in the same manner as if the child were attending the public schools. Payment by a local school board pursuant to this subsection to a parent or guardian who is obligated to pay for a child's attendance at a private nonsectarian school for the handicapped shall be by a check jointly payable to such school and to such parent or guardian. Payment by a local school board pursuant to this subsection to reimburse a parent or guardian who has paid for a child's attendance at a private nonsectarian school for the handicapped shall be by check payable to the parent or guardian.

4. The two local school boards named as defendants herein, however, do provide additional funding as follows:

Henrico County School Board provides additional funds up to five thousand dollars per school year on a sliding scale basis according to the parent's ability to pay. Such additional funding is apparently sufficient to cover over 95% of the tuition requests that have been made. Funding is not provided for medical treatment, psychotherapy, or medication.

The Fairfax County School Board, rather than reimbursing parents for cost involved in private placements, contracts directly with the private schools for 100% of the educational and transportational services provided to students. Expenses that are considered non-educational are those incurred for room, board, medical care and psychiatric treatment.

state grants still only covered seventy-five (75%) percent of the costs. The parents of handicapped children eligible for and in need of these private programs are thus forced to supplement the differences between the actual school costs and the state grants. Although some parents are able to supplement the tuition grants from insurance, other governmental agencies, private charities, personal resources and the like, many lack the financial resources to do so and this may mean that the child cannot be enrolled in a private school or that he or she is subject to be withdrawn or dismissed from the school. As a consequence, these children are denied the opportunity to receive an appropriate program of special education. In contrast are those children, handicapped and non-handicapped alike, who obtain an adequate education within the public system, and the affluent handicapped who can afford to take advantage of the tuition grants.

In an attempt to fill this unfair gap in services, local departments of social services have apparently permitted the practice of accepting legal custody of handicapped children and placing them in foster care for the purpose of receiving funding which would enable those children to receive special education services in private facilities. There are at least 38 children in foster care who were taken into custody primarily for that purpose, although the exact number cannot be determined.

This class action challenges both the tuition grant system established under § 22–10.8(a) and the practice of requiring custody as a condition precedent to the receipt of full educational funding. The former is challenged as violative of equal protection, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and substantive due process. Plaintiffs attack the latter as violative of the right to family integrity, equal protection, the Rehabilitation Act of 1973, and the Social Security Act, 42 U.S.C. § 625.

Plaintiffs contend that the Virginia partial tuition reimbursement system under Va.Code § 22–10.8(a) violates § 504 of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976 Supp.) in that such law requires the defendants to pay the full expenses of an appropriate education to the plaintiff class.

Section 504 provides in part as follows:

"No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

■ Since the Virginia public school system receives substantial federal assistance, the statute's prohibitions are clearly applicable to the instant defendants.

Defendants contend, however, that the Rehabilitation Act of 1973, 29 U.S.C. § 794 was designed to prohibit discrimination in employment and vocational training, not education, and that in any event Congress did not intend § 504 to require full funding for such services to the handicapped since subsequent legislation, Pub.L. 94–142. "Education for All Handicapped Children Act of 1975" is specifically aimed at the provisions of educational services and targets September 1, 1978 as the date for full funding.

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 "constitutes the establishment of broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap." 1974 U.S. Code Cong. & Ad.News, p. 6390. The congressional report on the 1974 amendments to the statute, which strengthened and broadened the Act's coverage, recognized the crucial role of educational opportunity for the handicapped:

"Without adequate education, individuals with handicaps are doomed to a continued life as second class citizens. Today our country is only educating forty percent of those individuals with handicaps. Sixty percent of these individuals are receiving a substandard education." 1974 U.S.Code Cong. & Ad.News, p. 6407.

■ Pub.L. 94–142, the "Education for All Handicapped Act of 1975" is essentially a funding statute, designed to provide the states with federal assistance to educate the handicapped. Although that statute does not contemplate full funding until September, 1978, it in no way impairs or diminishes the present right of handicapped children to an appropriate education under § 504. The legislative history of Pub.L. 94–142 indicates that Congress intended the statute to implement or "re-enforce" the "present right" of handicapped children to an education:

"Court action and State laws throughout the Nation have made it clear that *the right to education of handicapped children is a present right, one which should be implemented immediately.* The committee believes that these State laws and court orders must be implemented and that the Congress of the United States has a responsibility to assure equal protection of the laws and thus to take action to assure that handicapped children throughout the United States have available to them appropriate educational services. The Committee believes that *the provisions it has adopted in S.6 re-enforce this right to education . . ."* 1975 U.S.Code Cong. & Ad.News, p. 1441. (emphasis added).

State eligibility for funding through Pub.L. 94–142 requires the design and implementation of a detailed "state plan", providing for the comprehensive delivery of special education services designed to meet the unique needs of handicapped children, by September 1978. While recognizing the compelling nature of the problem presented to the Court by plaintiffs, there is no valid reason for this Court to attempt to provide a more comprehensive approach to the delivery of special education services than Congress has already accomplished through the enactment of Pub.L. 94–142. Any judicial decree would necessarily duplicate many of the implementation steps already underway by the state. To quote Judge Joiner, "this court could do no more than act as a cheering section" for the implementation of plaintiffs' statutory entitlement to an appropriate special education. *See Harrison v. Michigan*, 350 F.Supp. 846, 848 (E.D.Mich.1972). While Pub.L. 94–142 will in its implementation, also eliminate the equal protection difficulties of limited reimbursement schemes, we are of the view that plaintiffs are entitled to relief on their constitutional claims, and turn now to a discussion of those claims.

■ The fundamental constitutional question is whether the denial of full tuition under Va.Code § 22–10.8(a) (1976 Supp.) violates the right of the plaintiff class of handicapped children to the equal protection of the laws. Defendants rely on *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) for their view that there is no constitutional obligation upon the states to provide an education for the handicapped and further that the allocation of education resources which results in different services based on the relative wealth of the beneficiaries does not violate any constitutional rights.

In *Rodriguez*, the plaintiffs had attacked, as violative of equal protection, the Texas system of financing public education under which per pupil expenditures varied according to the wealth of each school district. The Court declined to review the school financing system under standards of strict judicial scrutiny finding that there was no impermissible interference with the exercise of a fundamental right and that there was no discrimination against any suspect class.

"For these two reasons—the absence of any evidence that the financing system discriminates against any definable category of 'poor' people or that it results in the absolute deprivation of education—the disadvantaged class is not susceptible of identification in traditional terms." *Supra*, 411 U.S. at 25, 93 S.Ct. at 1292.

Applying the more relaxed rational relationship test, the Court found that although concededly imperfect, the Texas system was rationally related to a legitimate purpose, assuring a basic education for every child in

the state while permitting significant control of each district's school at the local level. While holding that a state need not provide equal educational opportunities for all children, the Court refrained from deciding whether some minimum quantum of education for all children was constitutionally required. The Court posed a hypothetical situation in which the state imposed tuition requirements for its public schools and said this would result in "a clearly defined class of 'poor' people—definable in terms of their inability to pay the prescribed sum who would be absolutely precluded from receiving an education. That case would present a far more compelling set of circumstances for judicial assistance than the case before us today." *Supra*, 411 U.S. at 25 n.60, 93 S.Ct. at 1292.

The case at hand falls squarely within the hypothetical's embrace and indeed presents just such a compelling case for judicial assistance. Here the plaintiff class consists of those handicapped who are eligible for tuition grants but whose families are financially unable to provide them with an appropriate private educational placement, and are thus unable to avail themselves of the grants. As a consequence, these children sustain an absolute deprivation of a meaningful opportunity to enjoy the benefits of an appropriate education, while other handicapped school children in the state receive a publicly supported and appropriate education. Such a discriminatory exclusion from educational opportunity is violative of equal protection because it is irrational and fails to further any legitimate state interest. Although the challenged tuition law does not have any declared purposes, it is apparent that its principal intent is to provide an appropriate education to handicapped children who are not accommodated within the public school system. The effect of the tuition grant system, however, is to totally exclude children whose parents are without resources to supplement the grants. Such a result is not rationally related to either the state's interest in providing education to the handicapped or to its interest in preserving its financial resources, since the grant is fully available to those whose economic need is less, and unavailable as a practical matter to those whose economic need is greatest.

The previous cases involving similar challenges to tuition grant systems have not resolved the equal protection issue. In *McMillan v. Board of Education*, 430 F.2d 1145 (2d Cir. 1970), the Court confronted an equal protection challenge to a $2,000 limit on New York's tuition reimbursement system and concluded that the plaintiff's equal protection claims were substantial enough to merit review by a three-judge court. On remand, however, the district court abstained in favor of waiting for an adjudication by the state court; concluding that "it is possible—if not indeed likely—that as a matter of State law . . . will be interpreted by the New York courts so as to eliminate the constitutional question . . . ." 331 F.Supp. 302, 303 (S.D.N.Y. 1971). More recently, a challenge to the Pennsylvania tuition reimbursement system on equal protection grounds was initiated and the district court also found plaintiff's claims to be substantial enough to convene a three-judge court. *Halderman v. Pittenger*, 391 F.Supp. 872 (E.D.Pa.1975). Both courts were troubled by the result of such reimbursement systems which was to make the grants "fully available to those whose economic need is less" and unavailable to "those whose economic need is greatest." *Halderman, supra* at 875; *McMillan, supra* at 1149.

Other cases in which handicapped plaintiffs have asserted the right to an education have focused on violations of plaintiffs' equal protection rights vis-a-vis non-handicapped children.[5] The instant plaintiffs contend that the defendants must provide a

---

5. *See, e. g., Cuyahoga County Ass'n for Retarded Children v. Essex*, 411 F.Supp. 46 (N.D.Ohio 1976); *New York Ass'n for Retarded Children v. Rockefeller*, 357 F.Supp. 752 (E.D.N.Y.1973); *Lebanks v. Spears*, 60 F.R.D. 135 (E.D.La. 1973); *Harrison v. Michigan*, 350 F.Supp. 846 (E.D.Mich.1972); *Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, 334 F.Supp. 1257 (E.D.Pa.1971) and 343 F.Supp. 279 (E.D. Pa.1972).

public supported and appropriate education to all *handicapped* children as a matter of equal protection.

While there is substantial support for this contention since Virginia has undertaken to provide a free public school system for *all* children between the ages of 5 and 21 (Va. Code § 22–1.1), we need not reach that issue, concluding that the challenged statute, Va.Code, § 22–10.8(a), for other reasons, violates the equal protection guarantees under the Fourteenth Amendment.

The challenged statute, Va.Code § 22.10.-8(a), is violative of the equal protection guarantees under the Fourteenth Amendment by virtue of its exclusion from a publicly supported and appropriate education of the plaintiff class of poor handicapped children, while providing the same for those handicapped children whose parents are affluent enough to take advantage of the tuition grants.

Having concluded that the tuition grant system in issue is violative of the right to equal protection under the Fourteenth Amendment to the United States Constitution, this Court need not reach the issue left open by the Supreme Court in *Rodriguez, supra,* as to whether it also violates any due process rights the plaintiffs might have to a minimally adequate education.

 The evidence discloses that in several cities and counties, local departments of social services/welfare have apparently permitted the practice of accepting legal custody of handicapped children and placing them in foster care primarily for the purpose of receiving funding which would enable those children to receive special education services in private facilities. Plaintiffs appropriately contend that such practices violate their fundamental right to family integrity. *See Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10 (D.C. Iowa 1975). Such a practice, in effect, conditions the provision of a government service, special education, upon the relinquishment of a constitutional right. The evidence further discloses and the Court finds that while such practices have been engaged in they are contra to the policies of the State Department of Welfare and such egregious violations of the plaintiffs' rights, where they exist, must be determined on a case by case basis with the benefit of more fully developed factual records.[6]

 With respect to the equal protection violation, the relief must proceed as expeditiously as reasonably appropriate. The plaintiff class of handicapped children is currently excluded from any appropriate educational opportunity by virtue of the Virginia partial tuition reimbursement system. Recognizing education as "perhaps the most important function of state and local governments"[7] and Virginia's provision of an education to all other handicapped children, funds must be allocated equitably to the end that no child in the plaintiff class is excluded from an appropriate education. Lack of sufficient funds to finance all of the services and programs that are needed and desirable in the public school system is no justification for the

6. On April 7, 1976, William L. Lukhard, Commissioner, Department of Welfare, issued a clarification of foster care policy to all superintendents and directors of local departments of social services/welfare in which he advised each that interpretation of existing foster care policy governing the use of voluntary entrustments for custody of children did not include acceptance of custody of handicapped children solely for the purpose of providing special education.

7. "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the Armed Forces. It is the very foundation of good citizenship. Today, it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the State has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

resulting total exclusion of the plaintiff class from an appropriate education. The current funding systems in operation in Henrico and Fairfax Counties are excellent examples of systems passing constitutional muster, to the extent that they make the necessary funds available for enrollment in private programs.[8]

The State Board of Education has the primary responsibility for implementation of the judgment and decree of this Court. That Board pursuant to Va.Code 22–10.4 is specifically empowered to "prepare and place in operation a program of special education designed to educate and train handicapped children."

An appropriate order will issue.

8. See note 4, *supra*. However, such systems must provide the range of services included within the definition of "special education" as contained in Va.Code § 22–10.3(b). See note 2, *supra*.